**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-20637
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ENRIQUE GONZALES, JR.; ENRIQUE GONZALES, SR.;
and WILSON OLIVARES, a/k/a Olivares Wilson,

Defendants-Appellants.


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


_____

No. 96-20954
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ENRIQUE GONZALES, JR.,

Defendant-Appellant.



_____

Appeals from the United States District Court
for the Southern District of Texas
_____

August 26, 1997

Before POLITZ, Chief Judge, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Enrique Gonzales, Sr., Enrique Gonzales, Jr., and Wilson Olivares challenge their convictions of participation in a drug trafficking conspiracy. We affirm.

I.

A.

A drug trafficking task force, including officers of the Department of Public Safety, the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and the Houston Police Department learned of a potential drug dealer from a confidential informant, Jose Benvides, who advised officers that a man named "Doni" had offered to sell him a large quantity of cocaine. Relying on this information, the task force planned a sting. Benvides was instructed to arrange the transaction, advising Doni that his "cousin" wished to purchase a large quantity of cocaine. An undercover officer, Oscar Garcia, posed as Benvides's cousin. Benvides and Doni agreed that Garcia would purchase two kilograms of cocaine from Doni for $44,000, and Doni instructed Benvides and Garcia to meet him at a bar to execute the transaction.

After Benvides and Garcia arrived at the designated location, Doni introduced himself to Garcia and asked to see the money. Garcia displayed $42,000 in "show money" that he had obtained for the sting. After satisfying himself that the money was sufficient,

Doni placed a phone call to his associates and confirmed the deal. Doni's associates returned the call approximately one hour later, and Doni directed Garcia to the location of the final transaction. Garcia convinced Doni to ride with Benvides, then notified the task force of their destination.

When the three men arrived at their destination, a warehouse, Benvides was taken inside to verify that the cocaine was present. Meanwhile, Garcia remained outside and met the surveillance team, arranging a final "bust signal" and handing off the "show money." Shortly thereafter, Benvides called to confirm the presence of the cocaine, and Garcia approached the warehouse.

Before Garcia could enter, Doni asked to see the money again. Having already handed off the money, Garcia stalled and demanded to see the drugs first. Doni was adamant, however, and eventually Garcia instructed Benvides to retrieve the money from his car, knowing Benvides would find nothing. The situation grew volatile. During this exchange, Doni realized that Garcia was carrying a pistol and became highly agitated, despite Garcia's reassurances. Finally, when Doni realized that Benvides could not find the money, he began to retreat into the warehouse. Garcia followed Doni, giving the "bust signal" as he approached the warehouse door.

As Garcia entered the warehouse, he observed Doni gesturing to someone inside, and he saw Olivares standing beside a pool table. Olivares immediately reached down beside the pool table and Garcia, fearful that Olivares was reaching for a weapon, drew his revolver, and identified himself as a police officer. Olivares did draw a

3

weapon, but replaced it inside the table when confronted by Garcia.

Simultaneously, the surveillance team entered the warehouse and secured the premises, handcuffing everyone inside. While securing the premises, one member of the surveillance team, Officer Hans Meisel, discovered a loaded machinegun jutting out from a missing panel in the pool table.[1]

The officers learned that Olivares was living in the warehouse and requested permission to search. Olivares signed a consent form, and the officers proceeded to search the warehouse for the drugs. Benvides explained that Gonzales, Sr., had escorted him upstairs to view the cocaine, and he directed the officers to the location. The drugs had been moved, however, and a narcotics detection dog was called in to locate the drugs, which were found inside a brown paper bag that had been placed inside a bag of concrete. Fingerprint testing subsequently revealed that a palm print on the brown paper bag matched those of Gonzales, Jr. The officers confiscated 1,998.4 grams of cocaine.

As Meisel was leaving with the cocaine, Gonzales, Jr., mocked him, saying "we made you work for that s---, you all thought you weren't going to find it," and claiming "all of that is mine." In response to a query by Meisel, Gonzales, Jr., explained that he was referring to "the coke and the gun."

---

[1] An ATF expert testified that the rifle was initially manufactured between 1980 and 1982 as a semi-automatic weapon but had been modified to perform as a machinegun. Furthermore, the home-made machinegun was not registered in the National Firearms Registration and Transfer Records.

4

The appellants indicted on charges of possession with intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(1)(1) and 841(b)(1)(B); conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o). They filed motions to suppress the cocaine, and Gonzales, Jr., moved to suppress his incriminating statements. At the suppression hearing, Meisel testified that Gonzales, Jr., had made his incriminating statements voluntarily and without interrogation, and Garcia corroborated Meisel's account. The district court denied the motions to suppress.

The jury convicted on all counts. The district court denied motions for judgments of acquittal. The government gave notice that it intended to seek the thirty-year sentence enhancement for using and carrying a machinegun during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c). The defendants objected, claiming that this aggravating factor had not been included in the indictment and could not be considered in the sentencing decision. The defendants claimed they were informed at arraignment that the maximum penalty under § 924(c) was five years in prison, thus the sentence enhancement would offend due process. The district court overruled the objections and adopted the presentence reports, sentencing each defendant to 78 months on

counts one, two, and four, to be served concurrently, and 360 months on count three, to be served consecutively, for a total sentence of 438 months' imprisonment.

## II.

Defendants argue that the evidence was insufficient to support their convictions for conspiracy, possession with intent to distribute, and the firearms offenses. We disagree.

### A.

In a sufficiency challenge, we view the evidence in the light most favorable to the verdict and afford the government the benefit of all reasonable inferences. *See United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 794 (1996). The verdict must be affirmed if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See United States v. Walters*, 87 F.3d 663, 667 (5th Cir.), *cert. denied*, 117 S. Ct. 498 (1996); *Dean*, 59 F.3d at 1484.

### B.

Olivares argues that the evidence was insufficient to prove that he participated in the conspiracy to distribute cocaine, nor did it prove that he aided and abetted the substantive offense of possession with intent to distribute cocaine. We disagree.

1.

In order to sustain a conviction for conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, the government must prove three essential elements: (1) that an agreement existed to violate federal narcotics laws; (2) that the defendant knew of the existence of the agreement; and (3) that the defendant voluntarily participated in the conspiracy. *See United States v. Garcia*, 86 F.3d 394, 398 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 752 (1997); *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993); *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992).

The essential elements of conspiracy may be established by circumstantial evidence. *See United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994); *Cardenas*, 9 F.3d at 1157. "The government need not prove the essential elements by direct evidence alone. The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" *Maltos*, 985 F.2d at 746 (citations omitted); *Ayala*, 887 F.2d at 67. Therefore, we have consistently held that the jury may infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others. *See Cardenas*, 9 F.3d at 1157; *Ayala*, 887 F.2d at 67.

Nevertheless, Olivares claims that the evidence established only his "mere presence" at the crime scene, not his participation in the narcotics conspiracy. This argument is unavailing.

7

Granted, "it is well established that mere presence at the crime scene or close association with conspirators, *standing alone*, will not support an inference of participation in the conspiracy." *Maltos*, 985 F.2d at 746 (emphasis added). It is equally settled, however, that "presence or association is a factor that, *along with other evidence*, may be relied upon to find conspiratorial activity by the defendant." *Cardenas*, 9 F.3d at 1157 (emphasis added).[2] Olivares's presence at the crime scene, corroborated by physical evidence discovered there and the testimony of the arresting officers, was sufficient to support the inference that he was a member of the conspiracy.

Garcia testified that when he entered the warehouse, he observed Doni make a hand gesture to someone inside. Moreover, immediately upon entering the warehouse, Garcia observed Olivares reaching down beside the pool table as if reaching for a weapon. In response, Garcia identified himself and drew his own revolver, at which time Olivares replaced his weapon inside the pool table. Finally, Meisel testified that he discovered a machinegun jutting out from a missing panel in the pool table. This evidence supports an inference that Olivares was a member of the conspiracy, responding to the hand signals of a co-conspirator in an attempt to protect the conspiracy by force. Given this testimony, the jury reasonably could conclude that "this was a case of culpable presence as opposed to mere presence." *United States v. Echeverri*, 982 F.2d 675, 678 (1st Cir. 1993).

---

[2] *Accord Casilla*, 20 F.3d at 603; *Maltos*, 985 F.2d at 746.

8

2.

Likewise, a defendant may be convicted of aiding and abetting a criminal offense when he associates with the criminal activity, participates in it, and acts to help it succeed. *See United States v. Pedroza*, 78 F.3d 179, 183-84 (5th Cir. 1996); *United States v. Vaden*, 912 F.2d 780, 783 (5th Cir. 1990); *see also* 18 U.S.C. § 2 (prohibiting aiding and abetting a criminal offense). A defendant may be convicted of aiding and abetting the offense of possession with intent to distribute a controlled substance even if he did not have actual or constructive possession of the substance. *United States v. Pena*, 949 F.2d 751, 755 (5th Cir. 1991).

In order to sustain a conviction for possession with intent to distribute under 21 U.S.C. § 841(a)(1), the government must prove three essential elements: (1) knowing (2) possession of a controlled substance (3) with intent to distribute it. *See United States v. Brown*, 29 F.3d 953, 958 (5th Cir. 1994). The elements of possession with intent to distribute may be established by circumstantial evidence. *Cardenas*, 9 F.3d at 1158; *Ayala*, 887 F.2d at 68. Furthermore, intent to distribute may be inferred from a large quantity of illegal narcotics and the value and quality of the drugs. *Casilla*, 20 F.3d at 603; *Cardenas*, 9 F.3d at 1158; *Ayala*, 887 F.2d at 68. In the instant case, it is undisputed that the defendants knowingly possessed the cocaine with the intent to distribute it. Therefore, the elements of the predicate possession offense are established.

Likewise, the evidence was sufficient to prove that Olivares

9

aided and abetted the possession offense.  The evidence supporting a conspiracy conviction is generally sufficient to support an aiding and abetting conviction as well.  *Casilla*, 20 F.3d at 603; *United States v. Salazar*, 958 F.2d 1285, 1292 (5th Cir. 1992).  The instant case is no exception.  Olivares attempted to draw a machinegun to protect the conspiracy, which certainly constitutes an affirmative act designed to help the criminal activity succeed.  *See*, *e.g.*, *United States v. Polk*, 56 F.3d 613, 620 (5th Cir. 1995); *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir.), *cert. denied*, 514 U.S. 1134 (1995).  Viewing the evidence in the light most favorable to the verdict, the jury was entitled to conclude that Olivares had aided and abetted the possession offense.

## C.

Gonzales, Jr., argues that the evidence was insufficient to support his convictions for unlawful possession of a machinegun and aiding and abetting the use of a firearm during and in relation to a drug trafficking crime.  We disagree.

## 1.

Gonzales, Jr., claims that the evidence was insufficient to support his conviction for unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(*o*), because the government failed to prove beyond a reasonable doubt that Gonzales did not possess the

machinegun prior to May 19, 1986.  His claim is meritless.[3]

The statute provides that it shall be unlawful for any person to transfer or possess a machinegun, but there is an exception for "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect." 18 U.S.C. § 922(*o*)(2)(B).  Gonzales, Jr., argues that the statute requires the government to demonstrate, beyond a reasonable doubt, that the defendant did *not* lawfully possess the machinegun before the effective date of the statute.  We disagree.

The Due Process Clause requires the government to prove only the essential elements of the offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 361-64 (1970).  The exception for lawfully possessed machineguns is an affirmative defense, however, not an element of the offense.  Therefore, the government is under no duty to disprove this affirmative defense; on the contrary, the burden was on Gonzales, Jr., to establish this affirmative defense. *See United States v. Just*, 74 F.3d 902, 904 (8th Cir. 1996).[4] Having failed to prove that he lawfully possessed the machinegun prior to May 19, 1986, Gonzales, Jr., has failed to establish his affirmative defense, and the government is under no obligation to prove the negative.

---

[3] Gonzales, Sr., raises the same argument.

[4] *See also United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992) (noting that "a defendant who relies on an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception") (quoting *United States v. Guess*, 629 F.2d 573, 576 (9th Cir. 1980)).

11

2.

Gonzales, Jr., next argues that the evidence was insufficient to support the machinegun conviction because the government did not prove that Gonzales knew the weapon had been modified to fire as an automatic weapon.  To obtain a conviction under 18 U.S.C. § 922(*o*), the government must prove that the defendant knew the firearm was a machinegun.  *See Staples v. United States*, 114 S. Ct. 1793, 1804 (1994); *United States v. Brantley*, 68 F.3d 1283, 1289 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 964 (1996), *and cert. denied*, 116 S. Ct. 1334 (1996).

The jury reasonably could infer that the firearm intentionally had been converted into an automatic weapon and that Gonzales, Jr., was aware of the modification.  Indeed, Gonzales, Jr., brashly claimed to be the owner of the machinegun.  It defies credibility to suggest that the owner of a machinegunSSalbeit a modified semi-automatic rifle converted into a machinegunSSdid not realize that the rifle was an automatic weapon.

3.

Gonzales, Jr., next claims that the evidence was insufficient to prove that he aided and abetted the use of a firearm during and in relation to a drug trafficking crime.  Gonzales bootstraps himself to the argument raised by Olivares, claiming that the evidence was insufficient to prove that Olivares was a voluntary participant in the drug trafficking conspiracy.  *Ipso facto*, although Olivares "used" the machinegun by brandishing it when

12

Garcia entered the warehouse, Gonzales argues that this use of the machinegun was not an act "in relation to" the conspiracy, because Olivares was not a member of the conspiracy.  We disagree.

Given that the evidence was sufficient to demonstrate that Olivares was a member of the conspiracy, this claim must also fail. Olivares plainly brandished the weapon to protect the conspiracy, and this act obviously "facilitates or furthers the drug crime." *Smith v. United States*, 508 U.S. 223, 232 (1993).

D.

Gonzales, Sr., argues that the evidence was insufficient to support his convictions for aiding and abetting the possession of a machinegun and aiding and abetting the use of a firearm during and in relation to a drug trafficking crime.  On both issues, Gonzales claims that the government failed to produce even a shred of evidence suggesting that he either knew of or used the firearms, precluding his conviction as an aider and abettor.

We need not rely upon aider and abettor liability, however, because Gonzales, Sr., is also liable for the foreseeable acts of his co-conspirators, in accordance with the *Pinkerton* doctrine. Under the rule of *Pinkerton v. United States*, 328 U.S. 640 (1946), "a party to a conspiracy may be held responsible for a substantive offense committed by a coconspirator in furtherance of a conspiracy even if the party does not participate in or have any knowledge of the substantive offense."  *United States v. Jensen*, 41 F.3d 946, 955-56 (5th Cir. 1994) (citations omitted); *Dean*, 59 F.3d at 1489.

13

Accordingly, a defendant may be convicted under § 924(c) based on a co-conspirator's possession of a weapon during a drug trafficking crime, even if the defendant was unaware of the firearm possession. *Dean*, 59 F.3d at 1489; *accord United States v. Mendoza-Burciaga*, 981 F.2d 192, 198 (5th Cir. 1992). Based on the same principle, the *Pinkerton* doctrine also imposes vicarious criminal liability on defendants for co-conspirators' violations of § 922(*o*).

There is no question that Gonzales, Sr., was a "father figure" in the drug trafficking conspiracy. Benvides stated that when he entered the warehouse to inspect the cocaine, Gonzales, Sr., escorted him upstairs and showed him the cocaine. Based on this damning testimony and the circumstantial evidence, the jury reasonably could conclude that Gonzales, Sr., was a member of the drug conspiracy. Accordingly, under the *Pinkerton* doctrine, Gonzales, Sr., is vicariously responsible for the use of a firearm during and in relation to a drug trafficking crime and for the possession of an unlawful machinegun.

## III.

Defendants filed motions to suppress in the district court, and all three motions were denied following a suppression hearing. Gonzales, Sr., and Olivares argue that the warehouse was searched without a warrant or effective consent, and Gonzales, Jr., claims that the incriminating statements he made incident to arrest were the fruits of an unconstitutional custodial interrogation. Both claims are meritless.

14

A.

We review findings of fact rendered in a suppression hearing only for clear error, but conclusions of law are reviewed *de novo*. *See United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993). In reviewing a ruling on a motion to suppress, we view the evidence in the light most favorable to the party that prevailed in the district court, considering the evidence offered at the suppression hearing as well as the evidence admitted at trial. *Id.*

B.

A search conducted without a warrant is unreasonable *per se* and therefore unconstitutional under the Fourth Amendment, unless it is conducted pursuant to consent or under exigent circumstances. *See United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993). The Supreme Court has long held that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

In order to satisfy the consent exception, the government must establish that consent to search was freely and voluntarily given and that the individual who gave consent had authority to do so. *See United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995). The government must prove by a preponderance of the evidence that consent was voluntary and effective. *See United States v. Hurtado*, 905 F.2d 74, 75 (5th Cir. 1990).

Gonzales, Sr., and Olivares argue that the search of the

warehouse was unconstitutional for two reasons: first, Olivares did not have authority to consent to the search; and second, Olivares' consent was not voluntary.  We disagree.

## 1.

When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained from a third party, rather than from the person whose property was searched or seized, the government bears the burden of proving that the third party had either actual or apparent authority to consent.  To establish that a third party had actual authority to consent, the government must demonstrate "mutual use of the property by persons generally having joint access or control for most purposes."  *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).  To establish that a third party had apparent authority to consent, however, the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent.  *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).

At the suppression hearing, Meisel testified that the surveillance team entered the warehouse and secured the premises, then immediately asked to speak to the owner of the warehouse. When the defendants explained that the owner was not present, the officers asked whether anyone was in the "care, custody and control" of the warehouse.  Olivares volunteered, explaining that he lived on the premises and was in control of the warehouse. Accordingly,  Meisel requested consent to search, and Olivares

16

signed a consent form authorizing the officers to search the warehouse.

The owner of the warehouse, Jesse Garcia, testified at the suppression hearing and confirmed that Olivares had been living in the warehouse for about two or three months prior to the arrest. Garcia also testified that Olivares was employed at the warehouse and enjoyed complete access to the warehouse. Accordingly, the government contends that Olivares possessed both actual and apparent authority to consent to the search.

Viewing the evidence introduced at the suppression hearing in the light most favorable to the government, the record supports the conclusion that Olivares possessed "joint access or control" of the warehouse, by virtue of the authority delegated to him by Garcia, and thus had actual authority to consent to the search. At a minimum, however, Olivares had apparent authority, as the officers reasonably believed that he had authority. Police officers are entitled to rely on the representations of persons regarding their authority to consent when the circumstances do not render such reliance unreasonable. *See Rodriguez*, 497 U.S. at 188.[5]

2.

Olivares contends that his consent was involuntary. The

---

[5] Olivares testified that he actually lived in a small brown house adjacent to the warehouse, rather than in the warehouse itself. This claim is irrelevant. First, Jesse Garcia testified that Olivares occasionally lived in the warehouse, worked in it, and enjoyed unlimited access to it. More importantly, Olivares represented himself as a resident of the warehouse and claimed that he possessed "care, custody and control" over it.

ultimate determination whether consent was voluntary is a question of fact to be determined from the totality of the circumstances; no single factor is dispositive. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The evidence introduced at the suppression hearing, when viewed in the light most favorable to the government, adequately demonstrates that the officers did not coerce Olivares into giving his consent.

## C.

Gonzales, Jr., argues that the district court erred in failing to suppress the incriminating statements he made during the arrest, claiming that they were the product of a custodial interrogation. We disagree.

As Meisel was leaving with the cocaine, Gonzales, Jr., voluntarily said, "we made you work for that s---, you all thought you weren't going to find it," and claimed "all of that is mine." Gonzales concedes that this statement was voluntary, and he does not contest its admissibility. In response to a question by Meisel, however, Gonzales further explained that he had been referring to "the coke and the gun." Because this incriminating statement was offered in response to a question by a police officer without the benefit of *Miranda* warnings, Gonzales claims it was inadmissible.

It is axiomatic that "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning."

18

*Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  The Supreme Court has defined "custodial interrogation" as "'*questioning initiated by law enforcement officers* after a person has been taken into custody . . . .'"  *Id*. (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (emphasis added)).  Gonzales, Jr., was in custody when he made the incriminating statements concerning the cocaine and the firearm,[6] but his comments were not a response to "questioning initiated by law enforcement officers."  To the contrary, Gonzales voluntarily initiated the colloquy, eliciting a response from Meisel. Accordingly, Meisel's request for clarification was not a "custodial interrogation" for purposes of the *Miranda* doctrine.

Meisel did not coerce Gonzales into his confession; instead, Gonzales freely and voluntarily boasted about his crimes, and Meisel simply requested that Gonzales clarify his statement.  This spontaneous colloquy does not constitute an "interrogation." "'Interrogation,' as conceptualized in *Miranda*, must reflect a measure of compulsion above and beyond that inherent in custody itself."  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  No such coercion is evident in the instant case.  To the contrary, Gonzales spontaneously initiated the dialogue with Meisel, thereby waiving his right to remain silent.[7]

---

[6] A suspect is "in custody" for purposes of *Miranda* when he is placed under formal arrest or when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest.  *United States v. Galberth*, 846 F.2d 983, 986 n.1 (5th Cir. 1988); *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

[7] The term "interrogation" refers to "[a] practice that the police should
(continued...)

Consequently, when a suspect spontaneously makes a statement, officers may request clarification of ambiguous statements without running afoul of the Fifth Amendment. Under similar circumstances, the Seventh Circuit has held that such requests for clarification of enigmatic statements are not prohibited by *Miranda*. *See Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990). Likewise, in the instant case, "[t]he police officer's question was a neutral response, intended to clarify [Gonzales's] puzzling declaration; it was not coercive interrogation that *Miranda* seeks to prevent." *Id*. at 532. Meisel did not "interrogate" Gonzales, Jr., and did not violate the Fifth Amendment.

Under these circumstances, the *Miranda* doctrine is inapposite. "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). This is not such a case, and the district court did not err in denying the motion to suppress.

IV.

The defendants claim that the prohibition against possession of an unlawful machinegun, 18 U.S.C. § 922(*o*), is unconstitutional under *United States v. Lopez*, 514 U.S. 549 (1995). To the

---

(...continued)
know is reasonably likely to evoke an incriminating response from a suspect." *Innis*, 446 U.S. at 301; *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989). Meisel took no affirmative steps to "evoke an incriminating response," but merely asked the suspect to clarify his spontaneous incriminating statement. This request for clarification does not rise to the level of an "interrogation" for purposes of the *Miranda* doctrine.

20

contrary, we recently held that § 922(*o*) is constitutional. *See United States v. Knutson*, 113 F.3d 27 (5th Cir. 1997).

V.

Gonzales, Jr., and Gonzales, Sr., urge us to hold that their indictments were fatally defective because they did not expressly charge the defendants with using a machinegun during and in relation to a drug trafficking crime. *See* 18 U.S.C. § 924(c).[8] Because the defendants were not charged with using a machinegun, they entreat this court to vacate their thirty-year sentences for using a machinegun in violation of § 924(c). In a similar vein, Olivares claims the arraignment proceedings were unconstitutional because he was not afforded fair notice of the charges against him. Therefore, Olivares also urges us to vacate his sentence. We decline these invitations.

A.

An indictment is constitutionally sufficient if it enumerates each element of the offense, notifies the defendant of the charges, and provides him with a double jeopardy defense against future prosecutions. *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Nevers*, 7 F.3d 59, 62 (5th Cir. 1993). The defendants claim that the indictment did not enumerate every

---

[8] Section 924(c)(1) provides that any person who uses or carries a firearm during or in relation to a drug trafficking crime shall be imprisoned for five years, in addition to the punishment provided for the drug trafficking offense. If the firearm is a machinegun, however, the defendant shall be sentenced to an additional 30 years' imprisonment. *See* 18 U.S.C. § 924(c)(1).

21

element of the offense as required by *Hamling*, because it did not expressly charge them with using a machinegun. We recently held that the thirty-year sentence for machinegun use is a sentence enhancement, however, rather than a separate offense. *See United States v. Branch*, 91 F.3d 699, 738-40 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1466-67 (1997). Accordingly, it need not be charged in the indictment in order to be constitutional. *Id*. at 740.

In addition, the defendants argue that they were deprived of fair notice of the charges against them, in violation of *Hamling*, because they were not expressly charged with using a machinegun. This claim is also meritless. An indictment provides fair notice if it states the specific facts and circumstances surrounding the offense in sufficient detail to inform a defendant of the charges. *See Hamling*, 418 U.S. at 117-18; *Nevers*, 7 F.3d at 63. Moreover, we will not invalidate an indictment for purely technical errors, but only for errors that mislead the defendant to his prejudice. *See Nevers*, 7 F.3d at 63.

The defendants were fully apprised that they had been charged with using a firearm during and in relation to a drug trafficking crime, in violation of § 924(c). Insofar as the indictment included all the elements of the offense, it adequately notified the defendants of the charges against them. Indeed, insofar as they were charged under § 924(c)(1), they may be charged with knowledge of the machinegun enhancement, which is expressly mandated by the plain language of the statute. While a statutory

citation in the indictment cannot substitute for a statement of the elements of the offense, it may reinforce other references in the indictment to establish notice of the charges. *United States v. Campos-Asencio*, 822 F.2d 506, 508 (5th Cir. 1987).

Finally, the defendants simultaneously were charged with possession of an unlawful machinegun in violation of § 922(*o*). Therefore, they cannot credibly claim that they were surprised by the invocation of the machinegun sentence enhancement after trial, and they have suffered no prejudice.

B.

Olivares contends that the failure to charge the defendants with using a machinegun rendered the arraignment unconstitutional, because he did not receive fair notice of the charges against him at the arraignment. We find no merit in this claim.

An arraignment must be conducted in open court and must consist of reading the indictment to the defendant or stating the substance of the charge to him. *See* FED. R. CRIM. P. 10. "The interests at issue are the defendant's right to know of the charges and the right to have adequate information from which to prepare a defense." *United States v. Correa-Venture*, 6 F.3d 1070, 1073 (5th Cir. 1993). Because the machinegun enhancement is not an element of the offense, and need not be included in the indictment, it is not a necessary element of the arraignment under rule 10. Olivares knew he was charged with violations of § 924(c), and he possessed adequate information to prepare his defense. The Due Process

23

Clause requires no more.

Indeed, since the thirty-year sentence for use of a machinegun is merely a sentence enhancement, rather than a separate offense, the Due Process Clause is satisfied if, as here, the defendant is notified of the sentence enhancement prior to sentencing, rather than trial. *See United States v. Anderson*, 987 F.2d 251, 257 (5th Cir. 1993).

## VI.

Olivares argues that the provision of § 924(c) mandating a thirty-year sentence enhancement for using or carrying a machinegun during and in relation to a drug trafficking crime is a cruel and unusual punishment, prohibited by the Eighth Amendment. This is an issue of first impression in this circuit.

## A.

The Eighth Amendment prohibits sentences that are grossly disproportionate to the crime. *See Solem v. Helm*, 463 U.S. 277, 288 (1983).[9] This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts. *See Rummel v. Estelle*,

---

[9] In *Solem*, the Court explained that claims of disproportionate punishment should be analyzed by considering three objective factors: (1) the gravity of the offense and the severity of the punishment; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same offense in other jurisdictions. *See Solem*, 463 U.S. at 290-92. Although the *Solem* criteria were articulated in a challenge to a state sentence, federal courts have applied a similar analysis in reviewing federal sentences. *See United States v. O'Banion*, 943 F.2d 1422, 1432 (5th Cir. 1991).

445 U.S. 263, 274-76 (1980). Indeed, in its most recent pronouncement concerning the proportionality doctrine, the Supreme Court reconsidered the constitutional foundation of the principle that disproportionate punishments are prohibited by the Eighth Amendment. *See Harmelin v. Michigan*, 501 U.S. 957 (1991).[10] It is evident, therefore, that the contours of the proportionality principle are less than pellucid.

The Supreme Court has equivocated on the historical pedigree and proper scope of the Eighth Amendment proportionality doctrine, but it has never retreated from the fundamental principle that the determination of sentences is primarily a legislative prerogative. *See Harmelin*, 501 U.S. at 998 (opinion of Kennedy, J.). Therefore, the courts must grant "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *Solem*, 463 U.S. at 290; *accord Harmelin*, 501 U.S. at 999 (opinion of Kennedy, J.) (citing cases). Accordingly, we may not substitute our own judgment concerning the appropriateness of a particular sentence. *See Solem*, 463 U.S. at 290 n.16; *accord United States v. O'Banion*, 943 F.2d 1422, 1433 (5th Cir. 1991).

Whatever the precise contours of the proportionality doctrine, therefore, it is firmly established that successful challenges to

---

[10] *Compare Harmelin*, 501 U.S. at 962-94 (opinion of Scalia, J.) (arguing that the Eighth Amendment does not permit proportionality review by the courts) *with id*. at 997-1005 (opinion of Kennedy, J.) (arguing that the Eighth Amendment permits "narrow" proportionality review) *and id*. at 1009-27 (opinion of White, J.) (arguing that proportionality review is central to the Eighth Amendment). *See also McGruder v. Puckett*, 954 F.2d 313, 315-16 (5th Cir. 1992) (discussing the evolution of the proportionality doctrine and its culmination in *Harmelin*).

the proportionality of punishments should be "exceedingly rare."
*See*, *e.g.*, *Harmelin*, 501 U.S. at 1001 (opinion of Kennedy, J.);
*Solem*, 463 U.S. at 289; *Hutto v. Davis*, 454 U.S. 370, 374 (1982);
*Rummel*, 445 U.S. at 272.  This is not such an extraordinary case.


B.

We have concluded that the proportionality principle survives, in the aftermath of *Harmelin*, only in a very circumscribed form. When adjudicating an Eighth Amendment proportionality challenge, we must first make a threshold comparison between the gravity of the charged offense and the severity of the sentence.  Only if we conclude that the sentence is "grossly disproportionate" to the offense may we proceed to consider whether it offends the Eighth Amendment, under the test announced in *Solem*.  If we conclude that the sentence is not "grossly disproportionate," our inquiry is finished, and we must defer to the will of Congress.  *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992).[11]

---

[11] *See*, *e.g.*, *Smallwood v. Johnson*, 73 F.3d 1343, 1347 (5th Cir.), *cert. denied*, 117 S. Ct. 212 (1996); *United States v. Fisher*, 22 F.3d 574, 579-80 (5th Cir. 1994); *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).  While we have stated, on at least one occasion, that *Harmelin* repudiated the proportionality doctrine entirely, *see United States v. Cooks*, 52 F.3d 101, 105 (5th Cir. 1995), that suggestion is contrary to *McGruder*, the governing interpretation of *Harmelin* in this circuit.  *See McGruder*, 954 F.2d at 316 (holding that the proportionality doctrine survived *Harmelin*); *Bradford*, 953 F.2d at 1012 (observing that *Harmelin* preserved the proportionality doctrine but substantially modified the analysis).

In *McGruder*, we held that the plurality opinion authored by Justice Kennedy constituted the least common denominator among a majority of the *Harmelin* Court, and we adopted its methodology as the rule governing claims of disproportionate punishment in this circuit.  *See McGruder*, 954 F.2d at 316.  Under that analysis, the essence of the inquiry is the nexus between the offense and the punishment, and "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the
(continued...)

To determine whether a sentence is "grossly disproportionate," we look to *Rummel v. Estelle*, 445 U.S. 263 (1980), as a benchmark.[12] In *Rummel*, the defendant had been sentenced to life imprisonment following his conviction for obtaining $120.75 by false pretenses, pursuant to a "recidivist statute" providing a mandatory sentence of life imprisonment for any defendant convicted of three felonies. Noting that the line-drawing function inherent in the determination of punishment is a matter within the discretion of the legislature, the Court held that the life sentence was not so grossly disproportionate as to offend the Eighth Amendment. *Id*. at 284-85.

In *McGruder*, we observed that *Rummel* provides a litmus test for claims that a particular sentence is "grossly disproportionate." *See McGruder*, 954 F.2d at 317. McGruder was convicted of burglary and sentenced to life imprisonment without possibility of parole under a habitual offender statute. We held that, when measured against *Rummel*, McGruder's sentence was not grossly disproportionate, observing that McGruder's convictions for armed robbery, escape, and burglary were more severe than the forgery and fraud offenses for which Rummel had been convicted. Insofar as the Supreme Court had held Rummel's sentence constitutional under the Eighth Amendment, we concluded that McGruder's sentence was

---

(...continued)
sentence imposed leads to an inference of gross disproportionality." *Harmelin*, 501 U.S. at 957 (opinion of Kennedy, J.).

[12] We have observed that *Rummel* survived the subsequent decision in *Solem* and controls in all cases that are not "clearly distinguishable" from *Rummel*. *See Smallwood*, 73 F.3d at 1347; *Burt v. Puckett*, 933 F.2d 350, 352 (5th Cir. 1991).

likewise constitutional, holding that his life sentence was not "grossly disproportionate" as a matter of law.  *Id*.

As our analysis in *McGruder* demonstrates, *Rummel* establishes a benchmark for claims of disproportionate punishment under the Eighth Amendment.  *See Smallwood v. Johnson*, 73 F.3d 1343, 1347-48 (5th Cir.), *cert. denied*, 117 S. Ct. 212 (1996).  We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law.[13]  Nevertheless, we can say with certainty that the life sentence approved in *Rummel* falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

## C.

Measured against the *Rummel* benchmark, the thirty-year sentence enhancement for using or carrying a machinegun during and in relation to a drug offense is plainly constitutional.  First, the gravity of the offense is substantially greater than were the crimes punished in *Rummel*.  We have recognized that machineguns are uniquely associated with drug trafficking and crimes of violence, posing a grave threat to the public.  *See United States v. Kirk*, 105 F.3d 997, 1000-02 (5th Cir. 1997) (opinion of Higginbotham, J.)

---

[13] As Justice Scalia observed in criticizing the proportionality doctrine, "the standards seem so inadequate that the proportionality principle becomes an invitation to imposition of subjective values."  *Harmelin*, 501 U.S. at 986 (opinion of Scalia, J.).

28

(discussing the threat posed by machineguns and the drug trade), *petition for cert. filed*, 65 U.S.L.W. 3756 (U.S. May 5, 1997) (No. 96-1759). Like the convictions for armed robbery in *McGruder*, use of a machinegun during and in relation to a drug trafficking offense is a crime of violence *per se*, warranting severe penalties. *See McGruder*, 954 F.2d at 316-17. Measured against the convictions for fraud and forgery that formed the basis of Rummel's sentence, which pale in comparison to the violent crimes in the instant case, we are satisfied that the gravity of the offense warrants a severe punishment.[14]

Furthermore, the severity of the punishment is not excessive, as evidenced by a comparison to the *Rummel* benchmark. In *Rummel*, the Court upheld the constitutionality of a life sentence imposed on a non-violent criminal pursuant to a recidivist statute. *See Rummel*, 445 U.S. at 285. Likewise, in *McGruder* we upheld the constitutionality of a life sentence without possibility of parole under a habitual offender statute. *See McGruder*, 954 F.2d at 317. In contrast, the sentence enhancement at issue in the instant case merely imposes a sentence of thirty years for using or carrying a machinegun during and in relation to a drug trafficking offense.[15]

---

[14] The Supreme Court has observed that "[a]s the criminal laws make clear, non-violent crimes are less serious than crimes marked by violence or the threat of violence." *Solem*, 463 U.S. at 292-93.

[15] Proportionality review is particularly problematic when it is invoked to draw quantitativeSSrather than qualitativeSSdistinctions among punishments. For example, the Supreme Court has applied the proportionality doctrine to review the constitutionality of capital punishment, because "'[t]he penalty of death differs from all other forms of criminal punishment.'" *Rummel*, 445 U.S. at 272 (quoting *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (opinion of Stewart, J.)). In contrast, the Court has been reluctant to apply the proportionality doctrine

(continued...)

Accordingly, the thirty-year sentence enhancement for using or carrying a machinegun during and in relation to a drug trafficking crime is not "grossly disproportionate" to the gravity of the offense, when it is measured against the *Rummel* benchmark. The gravity of the offense is greater, and the penalty less severe, than were the life sentences upheld against Eighth Amendment challenges in *Rummel* and *McGruder*. Consequently, our inquiry is at an end.[16]

## VII.

Claiming that the machinegun was not admitted into evidence at trial, Gonzales, Jr., argues that the district court reversibly erred by allowing jurors to inspect it during deliberations. Following the verdict, the district court denied Gonzales's motion for judgment of acquittal.

## A.

This court takes a dim view of permitting jurors to consider

---

(...continued)
to prison terms, because "our decisions recognize that we lack clear objective standards to distinguish between sentences for different terms of years." *Harmelin*, 501 U.S. at 1001 (opinion of Kennedy, J.). Under these circumstances, we must be particularly deferential to legislative determinations of sentences. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (per curiam).

[16] *See Solem*, 490 U.S. at 290 n.16 ("In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate."); *United States v. Martinez*, 967 F.2d 1343, 1347-48 (9th Cir. 1992); *see also United States v. Duerson*, 25 F.3d 376, 384 (6th Cir. 1994) (citing *United States v. Elder*, Nos. 91-5605, 91-5606, 1992 WL 42346 (6th Cir. Mar. 3, 1992) (unpublished) (holding the machinegun sentence enhancement constitutional)); *United States v. Santos*, 64 F.3d 41, 45-47 (2nd Cir. 1995) (holding the silencer sentence enhancement under § 924(c) constitutional), *vacated on other grounds*, 116 S. Ct. 1038 (1996).

items that were not properly admitted into evidence. "It is firmly established in this circuit that a defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room 'unless there is no reasonable probability that the jury's verdict was influenced by the material that improperly came before it.'" *United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990) (citation omitted); *accord United States v. Ruggiero*, 56 F.3d 647, 652 (5th Cir.), *cert. denied*, 116 S. Ct. 397, *and cert. denied*, 116 S. Ct. 486 (1995). There is a rebuttable presumption of prejudice; consequently, the conviction must be reversed unless the government establishes that the error was harmless. *Ruggiero*, 56 F.3d at 652; *Luffred*, 911 F.2d at 1014. We need not reach this issue, however, if the machinegun was properly admitted into evidence.

B.

When the machinegun was first introduced by the government, defense counsel raised a chain of custody objection, and the court reserved a ruling on the question pending the remaining testimony. The issue did not arise again until the jury requested the weapon, at which time defense counsel renewed his objection, claiming that the weapon had never been admitted into evidence. On the contrary, the government responded that the chain of custody had been proven. After considering these arguments, the court overruled the objection and permitted the jury to inspect the machinegun.

This decision was tantamount to an implicit ruling that the

31

chain of custody had been proven and the evidence was admissible. We review the admission of evidence only for abuse of discretion. *See United States v. Royal*, 972 F.2d 643, 648 (5th Cir. 1992). After reviewing the record, we are satisfied that the government introduced sufficient testimony to establish the chain of custody, and the court did not abuse its discretion by admitting the machinegun into evidence.[17]

The instant case is distinguishable from *Luffred*, therefore, because the machinegun was properly admitted into evidence before it was submitted to the jury during deliberations. Consequently, the weapon was not "extrinsic evidence," and *Luffred* is inapposite. Whereas the *Luffred* jury inadvertently obtained extrinsic evidence, in the instant case the court expressly ordered that the machinegun be submitted to the jury. Under these circumstances, the court did not abuse its discretion in permitting the jury to inspect the machinegun.

C.

Even assuming *arguendo* that the district court erred in submitting the machinegun to the jury, the error was harmless. In determining whether the introduction of extrinsic evidence was harmless, we must consider its content, the manner in which it came before the jury, and the weight of the evidence offered against the

---

[17] Although we are satisfied that the weapon was admissible, we express no opinion as to whether the district court abused its discretion by reserving its ruling on the chain of custody objection until jury deliberations had commenced, as Gonzales, Jr., does not raise this issue on appeal.

32

defendant.  *Ruggiero*, 56 F.3d at 653; *Luffred*, 911 F.2d at 1014.

The government introduced overwhelming evidence to prove that the machinegun had been used during and in relation to the drug trafficking crime, including the testimony of Garcia, who confronted Olivares as he drew the machinegun, and Meisel, who discovered the weapon in the pool table.  Likewise, the government introduced the statement of Gonzales, Jr., who claimed to be the owner of the machinegun following his arrest.

Moreover, an ATF agent identified the weapon and testified that the semi-automatic rifle had been modified into an automatic weapon.  Finally, a photograph of the machinegun was submitted to the jury.  Under these circumstances, there is no reasonable possibility that the introduction of the machinegun influenced the verdict.[18]

## VII.

Gonzales, Jr., argues that the district court erred in denying his motion for new trial on the basis of newly discovered evidence, alleging that the government did not disclose exculpatory evidence before trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963). We reject this argument.

---

[18] Gonzales, Jr., cites *Luffred* for the proposition that the mere fact that the jury requests to consider extrinsic evidence renders it *per se* prejudicial. *Luffred*, 911 F.2d at 1014.  *Luffred* must be limited to its unique facts, however. The extrinsic material at issue there was a chart that illustrated a series of transactions, implying relationships that were not supported by the evidence. In contrast, the machinegun at issue in the instant case was physical evidence, and its submission did not introduce any inherently inadmissible or prejudicial material into the jury's deliberations.

## A.

We review *Brady* determinations *de novo*. *United States v. Green*, 46 F.3d 461, 464 (5th Cir.), *cert. denied*, 115 S. Ct. 2629 (1995). *Brady* violations require reversal only if there is a "reasonable probability" that the outcome of the trial would have been different if the evidence had been disclosed to the defendant. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is established only when the failure to disclose the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Although this standard does not require the defendant to establish that he would have been acquitted had the evidence been disclosed, he must establish that the suppression of exculpatory evidence by the government "'undermines confidence in the outcome of the trial.'" *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).

## B.

Donaciano Ortega ("Doni"), who pleaded guilty prior to trial, allegedly told the police he did not believe that Gonzales, Jr., had been involved in the drug conspiracy. Based on this statement, Gonzales, jr., claimed the government had suppressed exculpatory evidence.

Assuming *arguendo* that the alleged statement was exculpatory, it does not merit a new trial, as Gonzales, Jr., suffered no

prejudice.[19]  First, the district court noted that other witnesses testified that Gonzales, Jr., was not a member of the drug trafficking conspiracy.  We have consistently held that there is no *Brady* violation where  undisclosed evidence is merely cumulative.  *See Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir.), *cert. denied*, 117 S. Ct. 519 (1996).[20]

Furthermore, the evidence against Gonzales, Jr., was over-whelming.  Fingerprints on the paper bag containing the cocaine belonged to Gonzales, Jr.  He made incriminating statements following the arrest, claiming ownership of the cocaine and the machinegun.  Olivares testified that Gonzales, Jr., had owned the machinegun.  Given the weight of this evidence, the exclusion of one equivocal statement by a co-conspirator does not undermine confidence in the verdict, *Kyles*, 514 U.S. at 434-35, as there is no reasonable probability that Gonzales would have been acquitted if the exculpatory testimony had been admitted, *Bagley*, 473 U.S. at 682.

The judgments of conviction and sentence are AFFIRMED.

---

[19] At a hearing on the motion for new trial, the government hotly contested the charge that it had concealed exculpatory information, insisting that Doni did not exculpate Gonzales from the conspiracy.  Furthermore, Doni admitted that his opinion was not based on personal knowledge.  The district court found that the conflicting evidence was inconclusive, and it was not persuaded that Doni had made exculpatory statements obligating the government to disclose the testimony.  Because we conclude that Gonzales has failed to demonstrate prejudice, however, we need not consider whether the contested statements were subject to *Brady*.

[20] *See also Westley v. Johnson*, 83 F.3d 714, 725 (5th Cir. 1996) (finding no *Brady* violation where statements included in a suppressed offense report were contained in other records and testimony), *cert. denied*, 117 S. Ct. 773 (1997); *Allridge v. Scott*, 41 F.3d 213, 218 (5th Cir. 1994) (holding that the failure to disclose cumulative evidence could not have affected the outcome of the trial).